<u>Precedential</u>

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

_____

Case No:  05-1222

_____

LYNETTE M. PETRUSKA,

Appellant

v.

GANNON UNIVERSITY; THE BOARD OF TRUSTEES
OF
GANNON UNIVERSITY; WILLIAM I. ALFORD, II;
ROBERT H. ALLSHOUSE; JOSEPH F. ALLISON;
MICHAEL P. ALLISON, REV.; JAMES A. BALDAUF;
L. SCOTT BARNARD; GEORGE J. BEHRINGER;
ARNOLD E. BERGQUIST; LAWRENCE E. BRANDT,
REV. MSGR.; ROBERT L. BRUGGER, REV. MSGR.;
DONALD M. CARLSON; DANIEL C. CARNEVAL, D.O.;
STEPHANIE DOMITROVICH, HON.; THOMAS L.
DOOLIN;
JAMES J. DURATZ; ANTOINE M. GARIBALDI;
THOMAS
C. GUELCHER; WILLIAM M. HILBERT, SR.; BRIAN
J. JACKMAN; JAMES W. KEIM, JR.; MARY RITA
KUHN, SR., SSJ; THOMAS J. LOFTUS; ANNE C.
MCCALLION; JOSEPH T. MESSINA; MICHAEL J.

NUTTALL; JOHN E. PAGANIE; DENISE ILLIG
ROBISON;
JAMES J. RUTKOWSKI, JR.; JAMES A. SCHAFFNER;
HELEN M. SCHILLING, M.D., D.D.S.; JOHN M.
SCHULTZ, VERY REV.; ROBERT J. SMITH, REV.
MSGR.; LAWRENCE T. SPEICE, REV. MSGR.;
WILLIAM C. SPRINGER; JAMES G. TOOHEY; DONALD
W. TRAUTMAN, BISHOP; ANASTASIA VALIMONT, SR.
SSJ; RICARDA VINCENT, SR. SSJ; MELVIN
WITHERSPOON;
ALL OTHER KNOWN AND UNKNOWN MEMBERS OF
THE BOARD
OF TRUSTEES OF GANNON UNIVERSITY DURING
THE
TENURE OF DONALD W. TRAUTMAN, as members of
the
Board of Trustees of Gannon University; DAVID
RUBINO, MSGR., in their individual and official
capacities; NICHOLAS ROUCH, REV., in their
individual and official capacities

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. Action No. 04-80)
District Judge: The Honorable Sean J. McLaughlin

_____

Argued August 16, 2006[*]

_____

[*] This case was originally argued on October 20, 2005,
before Judges Smith, Becker, and Nygaard.  On May 23, 2006,
an opinion by a majority of the original panel was filed,
affirming in part, reversing in part, and remanding the case for
further proceedings.  Judge Smith filed a dissenting opinion on
the same day.  Judge Becker, who authored the majority
opinion, died on May 19, 2006, after the case had been

_____

BEFORE: SMITH, COWEN, and GREENBERG

(Filed: September 6, 2006 )

_____

C. John Pleban [Argued]
Pleban & Associates
2010 South Big Bend Boulevard
St. Louis, Missouri 63117
*Counsel for Appellant*

Evan C. Rudert [Argued]
Elderkin, Martin, Kelly & Messina
150 East 8th Street
Erie, Pennsylvania 16501

Arthur D. Martinucci [Argued]
Frank L. Kroto, Jr.
Quinn, Buseck, Leemhuis, Toohey & Kroto
2222 West Grandview Boulevard
Erie, Pennsylvania 16506-4508
*Counsel for Appellees*

Phillip J. Murren

_____

circulated to the full court, but before the opinions were filed. Appellants petitioned for rehearing en banc or, in the alternative, rehearing by a reconstituted panel. Because of this chain of events, the Court granted the Appellants' request for rehearing by a reconstituted panel. Judge Nygaard subsequently recused himself from the reconstituted panel. Judges Cowen and Greenberg were selected at random to replace Judges Becker and Nygaard.

3

Ball, Murren & Connell
2303 Market Street
Camp Hill, Pennsylvania 17011
*Counsel for Amicus-Appellee*

Stephen W. Fitschen
The National Legal Foundation
2224 Virginia Beach Boulevard, Suite 204
Virginia Beach, Virginia 23454
*Counsel for Amicus-Appellee*

<u>OPINION OF THE COURT</u>

SMITH, *Circuit Judge:*

Former University Chaplain Lynette Petruska appeals an order from the United States District Court for the Western District of Pennsylvania dismissing her federal employment discrimination and state law claims against Gannon University ("Gannon" or "the University"), the private Catholic diocesan college that employed her from July 16, 1997 until October 15, 2002. The District Court dismissed Petruska's complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), holding that the "ministerial exception"–a doctrine rooted in the First Amendment–barred her claims.

This Court has not previously ruled on the viability or the scope of the ministerial exception. Today, we join seven of our sister circuits in adopting the exception and hold that it applies to any claim, the resolution of which would limit a religious institution's right to choose who will perform particular spiritual functions.

Petruska's Title VII discrimination and retaliation claims,

4

as well as her state civil conspiracy and negligent retention and supervision claims, are barred by the ministerial exception insofar as they implicate a church's right to select its ministers under the Free Exercise Clause. Because resolution of Petruska's fraudulent misrepresentation and breach of contract claims do not limit Gannon's free exercise rights, and because an evaluation of these claims would not violate the Establishment Clause, they are not precluded by the exception. Nevertheless, Petruska has failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Accordingly, we will affirm the District Court's order dismissing Petruska's Title VII discrimination and retaliation claims, as well as her state civil conspiracy, negligent retention and supervision, and fraudulent misrepresentation claims. For the reasons set forth below, we will remand her breach of contract claim for further consideration by the District Court.

## I.    Factual and Procedural Background

For purposes of a motion to dismiss, we must accept as true–as did the District Court–the plaintiff's factual allegations. *See Mortensen v. First Fed. Sav. & Loan*, 549 F.2d 884, 891 (3d Cir. 1977) (explaining the standard of review for Rule 12(b)(1) and Rule 12(b)(6) motions).[1] Accordingly, the facts set forth below are drawn from Petruska's First Amended Complaint.

---

[1]As discussed *infra*, Gannon's motion to dismiss was framed in the alternative. Although we conclude that it is most properly construed as a Rule 12(b)(6) motion, we note that the standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Mortensen,* 549 F.2d at 891.

Gannon University is a private Catholic diocesan college located in Erie, Pennsylvania. Gannon hired Petruska as the University's Director of Social Concerns on July 16, 1997. At that time, Reverend Nicholas Rouch was the University Chaplain. When Rouch left to study in Rome for a period of three years, he was promised that he could resume his position as chaplain when he returned. In his absence, the University appointed an interim chaplain, who held the position until June of 1999. When the interim chaplain resigned, then-President Monsignor David Rubino promoted Petruska to permanent University Chaplain on July 1, 1999, with the advice and consent of Bishop Trautman, the Chair of Gannon's Board of Trustees (the "Board"). Petruska was the first female in Gannon's history to serve in that position. As such, and cognizant of the promise made to Rouch, Petruska specifically sought assurances from Rubino that she would not simply be replaced when Rouch returned or another qualified male became available. Rubino assured her that future decisions regarding her tenure as chaplain would be based solely on her performance, not her gender.

Several months after her appointment, in March of 2000, Rubino was forced to take a leave of absence when allegations surfaced that he was having a sexual affair with a female subordinate. Thereafter, another female employee accused Rubino of sexual harassment, and Petruska was instrumental in bringing this claim to the attention of Bishop Trautman and then-Provost Dr. Thomas Ostrowski. Rubino formally resigned in May of 2000, and Ostrowski was appointed Acting President. Following Rubino's resignation, and at Bishop Trautman's behest, Gannon began a campaign to cover-up Rubino's misconduct. Petruska strenuously–and

vocally–objected to the University's response.[2]

In July of 2000, Ostrowski met with Bishop Trautman, as well as Rouch, who had by then returned from Rome. Bishop Trautman notified Ostrowski that he had created a new position–Vice-President for Mission and Ministry–and that he had appointed Rouch to fill it. The position was created without input from any other University officials and did not include a job description. At that meeting, the Bishop informed Ostrowski that he was to remove Petruska as University Chaplain. When Ostrowski refused, Bishop Trautman instructed him to restructure the Chaplain's Division by placing it under the leadership of Rouch. Ostrowski also refused to take part in the proposed restructuring.

---

[2] Petruska's activism with respect to gender and harassment-related issues was not limited to her role in the Rubino affair. In 1998, while she was still the Director of Social Concerns, Petruska served on the University's Sexual Harassment Committee. At the time of her appointment to that Committee, the University was in the process of revising its sexual harassment policy, and several of Gannon's lawyers had advocated limiting the time period in which grievances could be filed. Petruska opposed this proposal, and her view ultimately prevailed.

Moreover, after she became chaplain and subsequent to Rubino's resignation, Petruska was appointed as Chair of Gannon's Institutional Integrity Committee. In this position, she was integrally involved in preparing a report for Gannon's Middle States accreditation, which criticized the University's policies and procedures related to discrimination and harassment. Despite a request from Gannon's President, the Committee refused to modify portions of its report which were critical of the University.

On July 28, 2000, Ostrowski told Petruska about his meeting with Rouch and Bishop Trautman. He explained the proposed restructuring and asked Petruska how she would respond if the Chaplain's Office were placed under Rouch's leadership. Petruska indicated that she would challenge this decision, and Ostrowski conceded that the proposed action was being taken on the basis of her gender. Although Ostrowski stated that he would try to prevent the restructuring and Petruska's removal, he later explained that he could delay, but not prevent, these events.

On October 2, 2000, Petruska signed a revised contract, which was equivalent to those of the other vice-presidents at Gannon. Her contract was thereby extended until June 30, 2003. From March to May of 2001, Ostrowski repeatedly suggested that Petruska consider accepting another position at Gannon, because Bishop Trautman and Reverend Rouch would never let her remain as University Chaplain. Ostrowski was removed from consideration in the presidential search on April 19, 2001.

On May 21, 2001, Dr. Antoine Garibaldi was appointed President of Gannon and he began his tenure on July 1, 2001. After Garibaldi became President, some of Petruska's responsibilities were reassigned and she was instructed to limit her comments at University events.

On August 21, 2002, Garibaldi notified Petruska that he had decided to restructure and informed her that she would be removed from the President's Staff and that the Chaplain's Division would report to Rouch. Garibaldi did not present the restructuring proposal to the University's President's Council as required by Gannon's Governance Manual. Petruska informed Garibaldi that she knew that this action was being taken against

8

her because of her gender and told him that she would be open to a "buy out" of her contract. Although Garibaldi indicated that he would be willing to discuss the restructuring, he later declined to discuss the matter with Petruska. After meeting with Garibaldi, Petruska orally requested information about filing a discrimination grievance with the University Review Council, but was notified in a letter dated August 28, 2002 that the University Review Council was not a proper forum because her complaint was directed against the President and Chair of the Board.

On September 30, 2002, Rouch called Petruska and indicated that he wanted to discuss the restructuring. She declined to meet with him until she resolved her concerns about the University's discriminatory conduct with Garibaldi. That same day, Petruska sent an e-mail to Garibaldi, stating that she intended to speak publicly about the questionable motives underlying the restructuring, but noted that she was willing to meet with him to discuss how all parties could "move forward" if Ricarda Vincent, the president of her community, was permitted to attend. Garibaldi did not respond. Petruska later learned that, during a telephone conversation between Bishop Trautman and Vincent, the Bishop "yelled" at Vincent. The next day, October 1, Vincent told Petruska that she could not take any action against Gannon, nor was she to make any comment about Gannon's discriminatory conduct. Faculty, staff, and students were informed of Petruska's "demotion" from the head of the Chaplain's Division.

On October 7, 2002, Rouch once again contacted Petruska regarding the restructuring. In response, she sent an e-mail to Garibaldi, noting that she had not yet received an answer to her request for a meeting. The next day, Garibaldi responded

to Petruska's e-mail, indicating that the University would take "appropriate action" if she did not report to Rouch. Believing that she was about to be fired, she tendered her resignation with two-weeks notice on October 14, 2002. The following day, Rouch and Bob Cline, Gannon's Human Resources Director, entered Petruska's office and told her that her resignation was accepted effective immediately.

Based on these events, Petruska filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on August 20, 2003. Upon exhausting her administrative remedies, she received a ninety-day "right-to-sue" letter. She filed this action in the United States District Court for the Western District of Pennsylvania against Gannon University, members of the Board of Trustees (including Trautman, Garibaldi, and Vincent), Rubino, and Rouch. Petruska asserted six claims: (1) gender discrimination in violation of Title VII against all Defendants; (2) retaliatory discrimination in violation of Title VII against all Defendants; (3) fraudulent misrepresentation against Gannon, Rubino, and Trautman; (4) civil conspiracy against Trautman, Garibaldi, and Rouch; (5) breach of contract against Gannon and Garibaldi; and (6) negligent supervision and retention against Gannon and its Board. Gannon moved to dismiss Petruska's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction, or in the alternative, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. The District Court granted the motion, concluding that the ministerial exception barred adjudication of Petruska's claims.

## II.    Gannon's Motion to Dismiss

The District Court granted the motion to dismiss pursuant

10

to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. Although we agree that the ministerial exception applies in this case, we conclude that the exception does not act as a jurisdictional bar, but rather, is best viewed as a challenge to the sufficiency of Petruska's claim under Rule 12(b)(6). *See, e.g., Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 654 (10th Cir. 2002).

At issue in a Rule 12(b)(1) motion is the court's "very power to hear the case."[3] *Mortensen*, 549 F.2d at 891. A Rule

--------

[3] As the District Court correctly noted, there are two types of Rule 12(b)(1) motions: those that attack the complaint on its face and those that attack subject matter jurisdiction as a matter of fact. When considering a facial attack, "the Court must consider the allegations of the complaint as true," and in that respect such a Rule 12(b)(1) motion is similar to a Rule 12(b)(6) motion. *Mortensen*, 549 F.2d at 891. However, as the court explained in *Mortensen*:

> The factual attack . . . differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction . . . there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that

12(b)(6) motion, by contrast, tests the legal sufficiency of plaintiff's claim. In other words, for purposes of resolving a Rule 12(b)(6) motion, the question is whether the plaintiff would be able to prevail even if she were able to prove all of her allegations. *Id.*

In this case, the question does not concern the court's power to hear the case–it is beyond cavil that a federal district court has the authority to review claims arising under federal law–but rather whether the First Amendment bars Petruska's claims. *See Elvig*, 375 F.3d at 955 ("Federal question jurisdiction is statutorily established, giving district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'"). In that respect, as the Tenth Circuit noted in *Bryce*, assertion of the ministerial exception–or, in that case, the "church autonomy doctrine"–is akin to a government official's defense of qualified immunity, which is often raised in a Rule 12(b)(6) motion. *Bryce*, 289 F.3d at 654. The exception may serve as a barrier to the success of a plaintiff's claims, but it does not affect the court's authority to consider them. We therefore review Petruska's complaint to determine whether she has stated a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). So construing the motion to dismiss, we have jurisdiction under 28 U.S.C. § 1291. *Jordan v. Fox Rothschild O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1251 (3d Cir. 1994). Our review is plenary. *Id.*

---

jurisdiction does in fact exist.

*Id.* In this case, the District Court treated the motion as a facial attack, but construed Petruska's references to matters outside the pleadings as an informal request to amend her complaint.

12

### III.    The Ministerial Exception to Title VII

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment on the basis of race, sex, national origin, or religion and forbids retaliation based on an employee's opposition to practices made unlawful under the statute.  42 U.S.C. § 2000e-2; 42 U.S.C. § 2000e-3.  The statute exempts religious entities and educational organizations from its non-discrimination mandate to the extent that an employment decision is based on an individual's religious preferences.  *See* 42 U.S.C. § 2000e-1(a) (providing an exception for "religious corporation, association, educational institution, or society with respect to employment of individuals of a particular religion to perform work connected with the carrying on . . . of its activities"); *see also* 42 U.S.C. § 2000e-2(e) (permitting religious educational institutions "to hire and employ employees of a particular religion").  By its terms, however, Title VII "does not confer upon religious organizations the right to make those same decisions on the basis of race, sex, or national origin." *Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985).

The questions presented in this case are whether applying Title VII to Gannon's decision to restructure would infringe upon its free exercise rights and whether adjudication of Petruska's Title VII claims would result in unconstitutional entanglement under the Establishment Clause.  Every one of our sister circuits to consider the issue has concluded that application of Title VII to a minister-church relationship would violate–or would risk violating[4]–the First Amendment and,

---

[4]    Whereas some courts have derived the ministerial exception from the doctrine of constitutional avoidance, *see,*

13

---

*e.g., McClure v. Salvation Army*, 460 F.2d 553, 560-61 (5th Cir. 1972), others have determined that, under its plain language, Title VII applies to ministerial employment decisions, but they have nevertheless concluded that such an application is unconstitutional, *see, e.g., Rayburn*, 772 F.3d 1164, 1165-67 (4th Cir. 1985). As a general rule, if there is a permissible construction of the statute which will not result in a "significant risk" of constitutional infringement, we are to adopt that construction without reaching the constitutional question. *Geary v. Visitation of the Blessed Virgin Mary Parish Sch.*, 7 F.3d 324, 327 (3d Cir. 1993). We conclude, as did the Fourth Circuit, that such an approach is not possible in this case.

Both the plain text of Title VII and its legislative history foreclose the possibility of imposing a limiting construction upon the statute. *See Rayburn,* 772 F.3d at 1165-67. As the *Rayburn* Court explained:

> While the language of § 702 [42 U.S.C. § 2000e-1] makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex or national origin. The statutory exemption applies to one particular reason for employment decision–that based upon religious preference. It was open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not.

*Id.* at 1166-67. Title VII's legislative history "reinforces the plain meaning of the statutory text." *Id.* at 1167. Although Congress has several times revisited the scope of the exemption

14

accordingly, has recognized some version of the ministerial exception.[5]  To the extent that a claim involves the church's

---

for religious employers, it has never extended to such institutions the authority to discriminate on the basis of sex. *See id.* at 1167.  Accordingly, we agree with the Fourth Circuit that Congress intended Title VII to apply to cases involving sexual discrimination and retaliation by religious institutions.  We must therefore reach the constitutional question–i.e., whether application of Title VII to a ministerial employment relationship violates the First Amendment.

[5] *See, e.g., EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000); *Rayburn v. Gen'l Conf. of Seventh Day Adventists*, 772 F.2d 1164 (4th Cir. 1985); *Combs v. Central Texas Annual Conf. of the United Methodist Church,* 173 F.3d 343 (5th Cir. 1999); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003); *Young v. Northern Illinois Conf. of United Methodist Church*, 21 F.3d 184 (7th Cir. 1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360 (8th Cir. 1991); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004); *Bollard v. Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999); *Gellington v. Chistian Methodist Episcopal Church*, 203 F.3d 1299 (11th Cir. 2000);  *EEOC v. Catholic Univ. of Amer.*, 83 F.3d 455 (D.C. Cir. 1996); *see also Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) (applying ministerial exception to Americans with Disabilities Act claim); *Werft v. Desert Southwest Annual Conf. of the United Methodist Church*, 377 F.3d 1099 (9th Cir. 2004) (same).

The First Circuit also addressed the application of the First Amendment to a minister's claims in *Natal v. Christian Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989).  Although the case involved state law claims rather than any federal employment discrimination law, the Court made clear that

selection of clergy–in other words, its choice as to who will perform particular spiritual functions[6]–most of these circuits

---

inquiry into allegations related to a minister's employment would be barred by the First Amendment.  Specifically, it explained:

> Because of the difficulties inherent in separating the message from the messenger–a religious organization's fate is inextricably bound up with those whom it entrusts with the responsibilities of preaching its word and ministering to its adherents–Natal's case necessarily falls within the scope of the Court's monition.  By its nature, the inquiry which Natal would have us undertake into the circumstances of his discharge plunges an inquisitor into a maelstrom of Church policy, administration, and governance.  It is an inquiry barred by the Free Exercise Clause.

*Id.* at 1578.

[6] In evaluating whether a particular employee is subject to the ministerial exception, other circuits have concluded that the focus should be on the "function of the position."  *Rayburn*, 772 F.2d at 1168.  As a general rule, an employee will be considered a minister if her primary duties include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship."  *Id. at* 1169; *see, e.g., Alicea-Hernandez*, 320 F.3d at 703 (applying ministerial exception to Hispanic Communications Director who functioned as a "press secretary" for the church); *Starkman*, 198 F.3d at 175-76 (holding that Choir Director at Methodist church was minister for purposes of First Amendment analysis); *Catholic Univ.*, 83 F.3d at 455 (applying exception to professor of canon law at Catholic

have held that the exception bars any inquiry into a religious organization's underlying motivation for the contested employment decision.[7]

---

University). Although we do not view this list as exclusive, we agree that a focus on the function of an employee's position is the proper one.

[7]  *See Rayburn*, 772 F.2d at 1169 ("[T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content."); *Combs*, 173 F.3d at 350 ("We cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread."); *Young*, 21 F.3d at 186 (quoting *Rayburn*, 772 F.2d at 1169 ); *Scharon*, 929 F.2d at 363 ("Personnel decisions by church-affiliated institutions affecting clergy are *per se* religious matters and cannot be reviewed by civil courts for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made. This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids.") (citations omitted); *Bollard*, 196 F.3d at 947 (indicating that a "Jesuit order's choice of representative" is ordinarily "a decision to which we would simply defer without further inquiry"); *Minker*, 894 F.2d at 1357 (finding that court need not determine whether reasons for employment decision were "independently ecclesiastical in nature" to apply ministerial exception).

17

Although we have not previously confronted a factually appropriate case in which to determine whether the ministerial exception is constitutionally warranted, we have acknowledged and cited with approval its application by other courts of appeals. *See Little v. Wuerl*, 929 F.2d 944, 947 (3d Cir. 1991) (citing *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972); *Rayburn,* 772 F.2d 1164) ("Relying on this basic principle, courts have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where the discrimination is alleged on the basis of race or sex."); *Geary v. Visitation of the Blessed Virgin Mary*, 7 F.3d 324, 329 (3d Cir. 1993) (citing *Scharon*, 929 F.2d at 363) ("Indeed, when the employee who challenges an employment decision is a member of the clergy, some courts have refused to allow even this limited inquiry."). Because we conclude that a federal court's resolution of a minister's Title VII discrimination or retaliation claim would infringe upon First Amendment protections, we now join those courts in adopting the exception.[8]

---

The Eleventh Circuit has recognized the ministerial exception, *see Gellington*, 203 F.3d 1299, but has not directly addressed whether the exception applies without regard to motive. We note, however, that the *Gellington* Court seemed to tacitly approve of a conclusion by the Fifth Circuit that "the constitutional protection of religious freedom afforded to churches in employment actions involving clergy exists even when such actions are not based on issues of church doctrine or ecclesiastical law." *Gellington*, 203 F.3d at 1303 (citing *Combs,* 173 F.3d at 350).

[8]   Although our sister circuits seem to agree that the ministerial exception is grounded in the First Amendment, their rationales for adopting the exception–as opposed to undertaking

some other remedial action–is often less clear.  As concerns remedy, the Supreme Court's recent decision in *Ayotte v. Planned Parenthood of Northern New England*, 126 S. Ct. 961 (2006), indicates that a narrow exception to prevent the unconstitutional enforcement of Title VII is the proper remedy.

In *Ayotte*, the Supreme Court considered the appropriate judicial response where the enforcement of a statute would render an unconstitutional result.  It held that "invalidating [a] statute entirely is not always necessary or justified" where courts are "able to render narrower declaratory and injunctive relief." *Id.* at 964.  The Court explained:

> Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem.  We prefer, for example to enjoin only the unconstitutional applications of a statute while leaving the other applications in force, see *United States v. Raines*, 362 U.S. 17, 20-22 (1960), or to sever its problematic portions while leaving the remainder in tact, *United States v. Booker*, 543 U.S. 220, 227-29 (2005).

*Id.* at 967.

The *Ayotte* Court set forth several guiding principles to "inform our approach to remedies."  *Id.*  It explained that the courts should not engage in "quintessentially legislative work," and accordingly, cautioned that we should not endeavor to draw lines where doing so would be "inherently complex." *Id.* at 968.  The Court also instructed us to consider the intent of the legislature: In other words, we must ask whether the legislature would "have preferred what is left of its statute or no statute at all[.]" *Id.*  Finally, in selecting a remedy, we must "try not to

19

**A.     The Free Exercise Clause of the First Amendment**

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I.  The Religion Clauses extend to both legislative and judicial action, *see Kreshik v. Saint Nicholas*

---

nullify more of a legislature's work than is necessary. . . ." *Id.* at 967.

In this case, we conclude that application of the ministerial exception is not "inherently complex": It requires federal courts to determine only whether the resolution of the plaintiff's claim would limit a church's right to choose who will perform particular spiritual functions.  Further, we agree with the implied findings of our sister circuits that Congress would prefer a tailored exception to Title VII than a complete invalidation of the statute.  Finally, our remedy is limited: It does not apply to *all* employment decisions by religious institutions, nor does it apply to *all* claims by ministers.  It applies only to claims involving a religious institution's choice as to who will perform spiritual functions.  We also note that this is the "finely drawn" remedy requested by Gannon.  *See id.* at 969 (noting that the parties recognized the possibility of a "modest remedy").     Accordingly, we conclude that the ministerial exception is the proper response to the constitutional defect in Title VII.

*Cathedral of the Russian Orthodox Church of North Amer.*, 363 U.S. 190, 191 (1960), and apply equally to state and federal laws, *see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

The Free Exercise Clause protects not only the individual's "right to believe and profess whatever religious doctrine one desires," *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990), but also a religious institution's right to decide matters of faith, doctrine, and church governance. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *see also Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976) ("[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical policy on matters of discipline, faith, *internal organization*, or ecclesiastical rule, custom, or law.") (emphasis added). In ministerial exception cases, those rights are interrelated.

First, like an individual, a church in its collective capacity must be free to express religious beliefs, profess matters of faith, and communicate its religious message. Unlike an individual who can speak on her own behalf, however, the church as an institution must retain the corollary right to select its voice. A minister is not merely an employee of the church; she is the embodiment of its message. A minister serves as the church's public representative, its ambassador, and its voice to the faithful. Accordingly, the process of selecting a minister is *per se* a religious exercise. As the Fifth Circuit explained: "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose." *McClure*, 460 F.2d at 558-

59. "Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 559.[9] Consequently, any restriction on the church's right to choose who will carry its spiritual message necessarily infringes upon its free exercise right to profess its beliefs. This right is squarely at issue in Petruska's First Amended Complaint.

The second right protected by the Free Exercise Clause–the church's right to decide matters of governance and internal organization–is also implicated by Gannon's decision to restructure. The Vice President for Mission and Ministry and the University Chaplain at Gannon both serve spiritual functions–in other words, the primary duties of those employees include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship."[10] *See Rayburn*, 772 F.2d at

---

[9]    In addition to their role within the religious organization, ministers also have a direct relationship with a church's members:  Ministers marry their children and bury their parents; they act as their spiritual counselors and serve as their moral advisors.  To these members, the selection of a minister is undoubtedly a question of religious concern.

[10]  Petruska argues that she was not a "chaplain" as that term is understood in the Roman Catholic Church, nor did she have any written job requirements which specifically defined her position at the University.  Nevertheless, Petruska's own complaint establishes that her primary duties involved ministerial functions.  Among other things, Petruska alleges that she served as co-chair for the Catholic Identity Task Force, held prayer services, and was traditionally involved in planning liturgies.  Moreover, as the District Court correctly noted, her own "performance objectives" included "develop[ing] strategies

1169.  Accordingly, Gannon's decisions regarding who to install in those positions and the manner in which their duties would be divided were decisions about who would perform those constitutionally protected spiritual functions.  Those choices are protected from governmental interference by the Free Exercise Clause.

The ministerial exception, as we conceive of it, operates to bar any claim, the resolution of which would limit a religious institution's right to select who will perform particular spiritual functions.  Accordingly, in this case, the relevant question with respect to each of Petruska's claims is whether application of the state or federal law will limit Gannon's right to choose who performs particular spiritual functions on its behalf.  Petruska asserts six claims in her First Amended Complaint: two violations of Title VII–discrimination and retaliation (Counts I and II, respectively); fraudulent misrepresentation (Count III); civil conspiracy (Count IV); breach of contract (Count V); and negligent supervision and retention (Count VI).  We conclude that resolution of Counts I, II, IV, and VI would impose

---

to increase participation in sacramental life of [the] Gannon community."  It is clear from the face of Petruska's complaint that the functions she performed as University Chaplain were ministerial in nature.

With respect to the Vice President of Mission and Ministry position, Petruska alleges that Rouch was installed in that role and served in a supervisory capacity over the Chaplain's Division.  To the extent that the Vice President of Mission and Ministry supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones.

unconstitutional limits on Gannon's First Amendment right to the free exercise of religion. Consequently, we hold that they are barred by the ministerial exception.

### 1.     Petruska's Title VII Claims

Petruska alleges that Gannon demoted and constructively discharged her from her position as University Chaplain based on her gender and retaliated against her on the basis of her opposition to sexual harassment at the University. Her discrimination and retaliation claims are premised upon Gannon's decision to restructure, a decision which Petruska argues was merely pretext for gender discrimination. It is clear from the face of Petruska's complaint, however, that Gannon's choice to restructure constituted a decision about who would perform spiritual functions and about how those functions would be divided. Accordingly, application of Title VII's discrimination and retaliation provisions to Gannon's decision to restructure would violate the Free Exercise Clause.[11] For that

---

[11] We acknowledge that it may not always be clear whether a minister's Title VII claim involves a church's decision regarding who will perform spiritual functions. For example, in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004), the Ninth Circuit considered a Presbyterian minister's claims that she was sexually harassed and subject to retaliation by her supervising pastor. The *Elvig* Court recognized that a church's decisions in selecting its clergy are protected by the First Amendment and held that to the extent that a plaintiff's claims implicated ministerial employment decisions, the claims were foreclosed. Nevertheless, over a vigorous dissent, the Court concluded that, in that case, the sexual harassment, hostile work environment, and retaliation claims (verbal abuse and intimidation) did not implicate

reason, Petruska's Title VII claims (Counts I and II) should be dismissed.

Petruska argues that Gannon waived its right to raise the ministerial exception as a defense by (1) failing to raise it before the EEOC; (2) accepting state and federal funds with conditions limiting discrimination; and (3) repeatedly and publicly representing itself as an equal opportunity employer. We find these arguments unpersuasive.

First, as the District Court correctly noted, although a plaintiff has an obligation to exhaust her administrative remedies as a prerequisite to suit, we are aware of no authority that requires a defendant to proffer every possible defense or legal argument before the EEOC, much less to raise all constitutional challenges. *Cf., e.g., McGinty v. New York*, 251 F.3d 84, 93-94 (2d Cir. 2001) (concluding that failure to raise Eleventh Amendment immunity as a defense did not result in waiver in subsequent federal court action under the ADEA); *Marie v. Allied Home Mortgage Corp.*, 402 F.3d 1, 15 (1st Cir.

---

protected employment decisions. It therefore reversed the district court's order dismissing those claims.

In Petruska's case, the retaliatory conduct at issue is the employment decision itself, which *Elvig* recognizes as a decision protected by the Free Exercise Clause. Because Petruska does not raise a sexual harassment or hostile work environment claim, and because the retaliatory conduct she alleges constitutes a protected choice, we need not decide today whether the types of claims at issue in *Elvig* would fall within the ministerial exception to Title VII.

2005) (holding that appellee did not waive right to raise arbitration defense in district court by failing to raise it before EEOC); *Brennan v. King*, 139 F.3d 258, 263 (1st Cir. 1998) (same). Moreover, as a general rule, an administrative agency is not competent to determine constitutional issues. *See, e.g, Weinberger v. Salfi*, 422 U.S. 479, 765 (1975) ("Exhaustion is generally required as a matter of preventing premature interference with agency process, so that the agency may function efficiently and so that it may have the opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review . . . . Plainly these purposes have been served once the Secretary has satisfied himself that the only issue is the constitutionality, a matter which is beyond his jurisdiction to determine . . . ."); *but cf. Bethlehem Steel Corp. v. Occupational Safety and Health Review Commission*, 607 F.2d 871, 876 (3d Cir. 1976) (concluding that in context of OSHA enforcement cases, "there are compelling reasons for insisting that fourth amendment claims for suppression of evidence . . . be tendered first to the Commission.").

        In this case, we can see no reason that the general rule regarding agencies' lack of competence to resolve constitutional claims should not apply. The EEOC has no special expertise to resolve First Amendment claims, nor is Gannon's assertion of the ministerial exception related to the EEOC's jurisdiction or administrative procedures. We therefore cannot conclude that Gannon's failure to raise the ministerial exception before the EEOC resulted in a waiver of its right to raise it in federal

court.[12]

Second, Gannon did not "waive" its First Amendment rights by representing itself as an "equal opportunity employer" or by accepting federal and state funds. A waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "'[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Id.* (citation omitted). Here neither Gannon's invocation of "equal employer" language nor its acceptance of funds constitutes a waiver of its First Amendment rights. By invoking the "equal opportunity" language, Gannon acknowledged only that it would comply with Title VII to the extent the statute applies to its employment decisions. It does not apply in this context. We thus agree that Gannon did not waive its right to raise the ministerial exception and we conclude that the District Court properly applied the exception to Petruska's Title VII claims.

## 2.    Petruska's State Tort Law Claims

---

[12] Petruska cites no persuasive authority to support her contention that Gannon is precluded from raising the ministerial exception for the first time in federal district court. The only case to which she points in support of this argument is the Ninth Circuit's decision in *Marshall v. Able Contractors, Inc.*, 573 F.2d 1055, 1057 (9th Cir. 1978). That case is inapposite. At issue in *Marshall* was a district court's order compelling the plaintiff to submit to OSHA inspections. The Ninth Circuit held that an agency should make a determination as to its own jurisdiction before a federal court considers it. In this respect, *Marshall* stands only for the proposition that an agency is entitled to consider its *own* jurisdiction and procedural requirements in the first instance.

27

Petruska's First Amended Complaint also contains three state tort claims: civil conspiracy (Count IV), negligent supervision and retention (Count VI), and fraudulent misrepresentation (Count III). The civil conspiracy[13] and negligent supervision[14] claims turn on Petruska's ability to prove that Gannon's restructuring constituted an unlawful or tortious act. Because the First Amendment protects Gannon's right to restructure–regardless of its reason for doing so–we cannot consider whether the act was unlawful or tortious and, therefore, these claims must be dismissed.

By contrast, Petruska's fraudulent misrepresentation claim requires no such conclusion. To establish a claim for fraudulent misrepresentation, a plaintiff must prove: "(1) a

---

[13] Civil conspiracy requires proof that two or more persons combined to do an unlawful act or to do an otherwise lawful act by unlawful means. *See, e.g., Thompson Coal Co. v. Pike Coal*, 488 Pa. 198, 211 (Pa. 1979). In this case, the alleged underlying unlawful act is the violation of Title VII.

[14] Under Pennsylvania law, an employer may be liable for negligent supervision "where the employer fails to exercise ordinary care to prevent an intentional harm to a third party which (1) is committed on the employer's premises by an employee acting outside the scope of his employment and (2) is reasonably foreseeable." *Mullen v. Topper's Salon & Health Spa, Inc.,* 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000) (citations omitted). Although Petruska's First Amended Complaint is replete with references to the current priest sexual abuse scandals and allegations that Bishop Trautman covered up harassment and abuse directed towards other individuals, the only intentional harm to which she claims she was personally subjected is the underlying discrimination and retaliation.

misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." *Martin v. Lancaster Battery Co.*, 530 Pa. 11, 19, 606 A.2d 444, 448 (Pa. 1992). Unlike Petruska's civil conspiracy or negligent supervision claims, which require proof of the unlawful act or intentional harm, the resolution of Petruska's fraudulent misrepresentation claim does not turn on the lawfulness of the decision to restructure, but rather upon the truth or falsity of the assurances that she would be evaluated on her merits when she was initially appointed as University Chaplain in July of 1999.

Because the state's prohibition against fraud does not infringe upon Gannon's freedom to select its ministers, resolution of Petruska's fraudulent misrepresentation claim would not violate the Free Exercise Clause. Nevertheless, we conclude that Petruska has failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b), and accordingly, affirm the District Court's dismissal of that claim.[15] *See Chistidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983) (indicating that the pleading requirements of Rule 9(b) "appl[y] not only to fraud actions

---

[15] In affirming the dismissal of Petruska's fraudulent misrepresentation claim on this basis, we anticipate that the District Court will afford her the opportunity to file an amended complaint. *Borelli v. City of Reading*, 532 F.2d 950 (3d Cir. 1976). Should she file an amended complaint which complies with the particularity requirement of Rule 9(b), the District Court is instructed to evaluate her claim consistent with the analysis set forth in section III.B. of this Opinion.

under federal statutes, but to fraud claims based on state law.").

### 3.    Petruska's State Law Contract Claim

In Count V of her First Amended Complaint, Petruska alleges that pursuant to her contract with Gannon, she was entitled to serve on the President's Staff and lead the Chaplain's Division.  She claims that by changing her responsibilities, Gannon breached its contract.

On its face, application of state contract law does not involve government-imposed limits on Gannon's right to select its ministers: Unlike the duties under Title VII and state tort law, contractual obligations are entirely voluntary.  As the court noted in *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990), "[a] church is always free to burden its activities voluntarily through contract, and such contracts are fully enforceable in civil court." *See also, e.g., Rayburn*, 772 F.2d at 1171 ("Like any other organization, [churches] may be held liable . . . upon their valid contracts.").  Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights. Accordingly, application of state law to Petruska's contract claim would not violate the Free Exercise Clause.

### B.    The Establishment Clause

Above and beyond its Free Exercise argument, Gannon contends that resolution of Petruska's claims would violate the Establishment Clause.  Because we conclude that Petruska failed to plead fraud with specificity and that her Title VII, civil conspiracy, and  negligent retention and supervision claims are

barred by the Free Exercise Clause, we need not address those claims further.  Petruska's claim for breach of contract, however, remains subject to review under the Establishment Clause.  Based upon our analysis in *Geary v. Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324 (3d Cir. 1993), we cannot conclude that review of this claim would, at the outset, unconstitutionally entangle the court in religion, and we therefore remand it  to the District Court.

In *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), the Supreme Court set forth a three-prong test to determine the validity of a statute under the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; . . . and finally, the statute must not foster 'an excessive government entanglement with religion.'"  Only the entanglement prong is at issue in evaluating Petruska's contract claim.

Entanglement may be substantive–where the government is placed in the position of deciding between competing religious views–or procedural–where the state and church are pitted against one another in a protracted legal battle.  *See, e.g., Catholic Univ.*, 83 F.3d at 465.  Therefore, courts typically consider the character of the claim, the nature of the remedy, and the presence or absence of a "direct conflict between the . . . secular prohibition and the proffered religious doctrine." *Geary*, 7 F.3d at 328.

In *Geary*, the question presented was whether judicial review of a Catholic school teacher's Age Discrimination in Employment Act (ADEA) claims would excessively entangle the courts where the school's stated reason for the adverse

employment decision was based on the plaintiff's marriage to a divorced man in violation of church doctrine. *Id.* We concluded that resolution of Geary's ADEA claims would not offend the Establishment Clause because the inquiry was limited to whether the school discriminated against Geary on the basis of her age and canceled her insurance in retaliation for her suit. *Id.* Geary did not challenge the validity of the religious doctrine; she merely claimed that the religious doctrine did not motivate the suit. *Id.* at 329. We therefore held that "when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement." *Id.* at 330.

The Court of Appeals for the District of Columbia Circuit took a similar approach to a minister's breach of contract claim in *Minker,* 894 F.2d at 1360. *Minker* involved a Methodist minister's claim that he was orally promised a more suitable pastorship, but was denied such a position based on his age. *Id.* at 1355. The *Minker* court affirmed the dismissal of the minister's ADEA and state law discrimination claim as well as a contract claim based on the Methodist Church's Book of Discipline, but reversed the dismissal with respect to the oral contract claim. *Id.* at 1359. The court acknowledged that inquiry into the church's reasons for failing to meet its contractual obligation could constitute excessive entanglement under the Establishment Clause, but nevertheless concluded that Minker's claim could "be adduced by a fairly direct inquiry" into whether there was an offer, acceptance, consideration, and breach. *Id.* at 1360. The court further noted that if resolution of the contract claim required inquiry into the church's ecclesiastical policy, the district court could grant summary judgment on entanglement grounds.

32

Although the ministerial exception does not apply to lay employees, we are presented with no principled reason to distinguish between clergymen and laity for purposes of determining whether resolution of a contract dispute will unduly entangle us under the Establishment Clause. Therefore, the question is whether Petruska's breach of contract claim can be decided without wading into doctrinal waters. Much like the claims in *Geary* and the oral contract claim in *Minker*, Petruska's breach of contract claim "do[es] not inevitably or even necessarily lead to government inquiry into [Gannon's] religious mission or doctrines." *Geary*, 7 F.3d at 329. Resolution of this claim does not turn on an ecclesiastical inquiry–or, at least not at the outset. If Gannon's response to Petruska's allegations raise issues which would result in excessive entanglement, the claims may be dismissed on that basis on summary judgment. Such a conclusion, however, is not inevitably drawn from the face of Petruska's complaint. We will therefore remand this claim for further consideration by the District Court.

## IV. Conclusion

The First Amendment protects a church's right to decide matters of faith and to declare its doctrine free from state interference. A church's ability to select who will perform particular spiritual functions is a necessary corollary to this right. The function of Petruska's position as University Chaplain was ministerial in nature, and therefore, her Title VII, civil conspiracy, and negligent retention and supervision claims–each of which directly turns on the propriety of Gannon's personnel decisions–must be dismissed. Likewise, Petruska's fraud claim was not plead with sufficient particularity to withstand a motion to dismiss. Accordingly, we will affirm

33

the District Court's order with respect to these claims.  For the
reasons set forth above, however, we will be remand Petruska's
contract claim for further consideration by the District Court.

34