UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
ERIE DISTRICT COURT

| | | |
|---|---|---|
| LYNETTE M. PETRUSKA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Cause No. 1:04-cv-00080-SJM |
| | ) | |
| GANNON UNIVERSITY, | ) | JURY TRIAL DEMANDED |
| | ) | |
| and | ) | |
| | ) | |
| THE BOARD OF TRUSTEES | ) | |
| OF GANNON UNIVERSITY | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM I. ALFORD II, ROBERT H. | ) | |
| ALLSHOUSE, JOSEPH F. ALLISON, | ) | |
| REV. MICHAEL P. ALLISON, JAMES | ) | |
| A. BALDAUF, L. SCOTT BARNARD, | ) | |
| GEORGE J. BEHRINGER, ARNOLD | ) | |
| E. BERGQUIST, REV. MSGR. | ) | |
| LAWRENCE E. BRANDT, REV. MSGR. | ) | |
| ROBERT L. BRUGGER, DONALD M. | ) | |
| CARLSON, DANIEL C. CARNEVAL, | ) | |
| D.O., HON. STEPHANIE | ) | |
| DOMITROVICH, THOMAS L. DOOLIN, | ) | |
| JAMES J. DURATZ, ANTOINE M. | ) | |
| GARIBALDI, THOMAS C. GUELCHER, | ) | |
| WILLIAM M. HILBERT, SR., BRIAN J. | ) | |
| JACKMAN, JAMES W. KEIM, JR., | ) | |
| SR. MARY RITA KUHN, SSJ, THOMAS | ) | |
| J. LOFTUS, ANNE D. McCALLION, | ) | |
| JOSEPH T. MESSINA, MICAHEL J. | ) | |
| NUTTALL, JOHN E. PAGANIE, | ) | |
| DENISE ILLIG ROBISON,  JAMES J. | ) | |
| RUTKOWSKI, JR., JAMES A. | ) | |
| SCHAFFNER, HELEN M. SCHILLING, | ) | |
| M.D., D.D.S., VERY REV. JOHN M. | ) | |
| SCHULTZ, REV. MSGR. ROBERT J. | ) | **EXHIBIT 1** |
| SMITH, REV. MSGR. LAWRENCE T. | ) | |
| SPEICE, WILLIAM C. SPRINGER, | ) | |

JAMES F. TOOHEY,                                  )
BISHOP DONALD W. TRAUTMAN,                        )
SR. ANASTASIA VALIMONT, SSJ,                      )
SR. RICARDA VINCENT, SSJ,                         )
MELVIN WITHERSPOON, and                           )
ALL OTHER  KNOWN AND                             )
UNKNOWN MEMBERS OF THE                           )
BOARD OF TRUSTEES OF GANNON                       )
UNIVERSITY DURING THE TENURE                      )
OF ITS CURRENT CHAIRMAN                           )
DONALD W. TRAUTMAN                               )
as members of the Board of Trustees of            )
Gannon University                                 )
                                                  )
and                                               )
                                                  )
BISHOP DONALD W. TRAUTMAN,                        )
MSGR. DAVID RUBINO,                              )
ANTOINE GARIBALDI, and                            )
REV. NICHOLAS ROUCH                              )
in their individual and official capacities,      )
                                                  )
        Defendants                                )

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, by and through counsel, pursuant to Federal Rules of

Civil Procedure 15(a) and 15(c) and for this Second Amended Complaint states as

follows:

## Parties

1.      Plaintiff, Lynette M. Petruska (hereinafter "Petruska") is a former

employee of Gannon University (hereinafter "Gannon" or "the University").  Plaintiff

was originally hired efective July 16, 1997 as the Director of the Center for Social

Concerns.  Two years later effective June 1, 1999, Petruska was promoted to University

Chaplain.  Petruska was the first female appointed to this position by the University.  At

the time Petruska was appointed, the Chaplain was a vice president level position without

the title, serving as the head of a division of the University. The Chaplain's position was also a cabinet level position serving on the President's Staff, President's Council and as a resource person for the Board of Trustees. At all times relevant herein, Plaintiff was a resident of the Western District of Pennsylvania. However, she is currently a resident of the State of Missouri.

2.     Gannon University is a private, Catholic, diocesan college established under the laws of the Commonwealth of Pennsylvania and located in Erie, in the Western District of Pennsylvania. Gannon receives both federal and state funding to further its educational mission.

3.     According to the University bylaws, the Board of Trustees of Gannon University (hereinafter "Board") is the governing body of the University, with "full and complete authority to conduct the affairs of the University." William I. Alford II, Robert H. Allshouse, Joseph F. Allison, Rev. Michael P. Allison, James A. Baldauf, L. Scott Barnard, George J. Behringer, Arnold E. Bergquist, Rev. Msgr. Lawrence E. Brandt, Rev. Msgr. Robert L. Brugger, Donald M. Carlson, Daniel C. Carneval, D.O., Hon. Stephanie Domitrovich, Thomas L. Doolin, James J. Duratz, Antoine M. Garibaldi, Thomas C. Guelcher, William M. Hilbert, Sr., Brian J. Jackman, James W. Keim, Jr., Sr. Mary Rita Kuhn, SSJ, Thomas J. Loftus, Anne D. McCallion, Joseph T. Messina, Michael J. Nuttall, John E. Paganie, Denise Illig Robison, James J. Rutkowski, Jr., James A. Schaffner, Helen M. Schilling, M.D., D.D.S, Very Rev. John M. Schultz, Rev. Msgr. Robert J. Smith, Rev. Msgr. Lawrence T. Speice, William C. Springer, James F. Toohey, Bishop Donald W. Trautman, Sr. Anastasia Valimont, SSJ, Sr. Ricarda Vincent, SSJ, Melvin Witherspoon, as well as all known and unknown members of the Board of Trustees of

Gannon University during the tenure of the Board's current chairman, Bishop Donald W. Trautman, are sued in their official capacity as members of said Board.

4.      Bishop Donald Trautman (hereinafter "Trautman") is Bishop of the Roman Catholic Diocese of Erie.  Pursuant to the University's  bylaws he is Chair of the Gannon Board, which reserves certain extraordinary powers to him as Bishop.  He is sued individually and in his official capacity.

5.      Msgr. David Rubino (hereinafter "Rubino") is the former president of Gannon University, having served from 1991 until May of 2000, when he was forced to resign because of acts of sexual misconduct directed against female subordinates set forth more fully below.  Rubino appointed Petruska as University Chaplain with the advice and consent of Trautman.  He is sued individually and in his former official capacity.

6.      Antoine Garibaldi (hereinafter "Garibaldi") is the current president of Gannon, having replaced Rubino effective July 1, 2001.  He demoted Plaintiff as the head of the Chaplain's Division based solely upon her gender, and thereafter, threatened to take disciplinary action against Plaintiff when Plaintiff protested the University's illegal discrimination against her.  These actions were taken under the direction of Trautman and Rouch, leading to Plaintiff's constructive discharge from the University.  He is sued individually and in his official capacity.

7.      Rev. Nicholas Rouch (hereinafter "Rouch") is the part-time Vice President for Mission and Ministry at Gannon.  This Vice President level position was unilaterally created by Trautman and Rouch was appointed to it, without input from the University or its Board, in the summer of 2000  after Rubino was forced to resign as president based upon the acts of sexual misconduct set forth more fully below.  He is sued individually

4

and in his official capacity.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

Alternatively, Plaintiff invokes the diversity jurisdiction of this Court pursuant to 28

U.S.C. § 1332 because she and the Defendants are citizens of different states and as set

forth below the amount in controversy exceeds $75,000.00.  Plaintiff further invokes the

supplemental jurisdiction of this Court to hear and decide claims arising under State law

pursuant to 28 U.S.C. § 1391(b).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and/or (b).

Plaintiff demands a jury trial pursuant to Fed.R.Civ.P. 38(b).

### Facts Common to All Counts

10.     This is a sex discrimination action seeking monetary damages due to

Gannon's discrimination against Plaintiff on the basis of her gender and in retaliation for

complaining about and/or opposing various acts of sex discrimination in violation of her

rights secured under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et

seq.*  Additionally, Plaintiff seeks damages against all Defendants for conspiring to

deprive her of her civil rights under Title IX as set forth below in Count III.  Plaintiff

further seeks damages against Gannon, Trautman and Rubino for fraudulent

misrepresentation, thereby inducing Plaintiff to work at Gannon and  take the position of

Chaplain as set forth in Count IV below.  Plaintiff further seeks damages against Gannon

and Garibaldi for breach of contract as set forth in Count V below.

11.     On July 16, 1997, Plaintiff was hired by Gannon to serve as the Director

of its Center for Social Concerns.  At the time Plaintiff was hired and currently, Gannon

represented itself and continues to represent itself as an equal opportunity employer that

5

does not discriminate on the basis of gender, among other things.

12.    Before Plaintiff was hired for the position in the Center for Social Concerns effective July 16, 1997, Plaintiff first met with Rouch, who offered Plaintiff the position, advising her that specific information regarding the salary and benefits of the position would be provided to her by Robert Cline (hereinafter "Cline"), Director of the University's Human Resources Department, with whom Plaintiff met shortly after Rouch offered her the position on or about June 2, 1997.

13.    At the meeting with Cline in early June 1997 in the Human Resources Office, Cline advised Petruska as to what her salary would be if she accepted the position at issue (diocesan wage), as well as the benefits of the position, to include but not necessarily be limited to health insurance, a contribution to her community's pension fund, a life insurance policy, and vacation days (to include time for an annual retreat). Because of Gannon's reputation at that time as an "old boy's club," Plaintiff further inquired of Cline as to the treatment of women on campus.  Cline represented to Plaintiff that Gannon was an equal opportunity employer that did not discriminate on the basis of gender, race or national origin.  At no time during the discussion with Cline about Gannon's equal employment policies did Cline advise Petruska that because she was a "ministerial employee" of the Chaplain's Office that these policies did not apply to her.

14.    Rather, the application of these policies to ministerial employees of the Chaplain's Office was regularly reinforced during Petruska's tenure at Gannon University by Gannon representing itself as an "equal opportunity employer" when attempting to fill "ministerial" positions in the Chaplain's Office.

15.    At the time Plaintiff was interviewed and hired, Rouch was

Chaplain at Gannon.  Shortly thereafter, Rouch left this position to begin three years of study in Rome.  Rouch was promised that he would return to the University as Chaplain when his studies were completed, and therefore, an interim Chaplain was appointed in July of 1997.  This interim chaplain, Rev. Ed Lohse, resigned the position effective June 1, 1999.  As Rouch was unwilling to return from Rome to fill the position, another Chaplain was needed.

16.    Plaintiff was appointed the permanent Chaplain of the University by Rubino effective June 1, 1999, with the advice and consent of Trautman.  Plaintiff was the first, and based upon Rouch's public comments after Petruska's employment with the University ended, will be the only female appointed as Chaplain at Gannon.

17.    Prior to accepting the appointment as University Chaplain, Plaintiff met with Rubino in his office with only Rubino and Petruska present.  At least two meetings took place between Rubino and Plaintiff to discuss Rubino's request that Plaintiff fill the open Chaplain's position.  The meeting at which the representations at issue took place occurred in mid-April 1999 and upon information and belief on or about April 9, 1999.  At this meeting in the President's Office, Plaintiff explained to Rubino that she was enough of a feminist that she did not want to be appointed to the position only to be replaced when a suitable male was found to fill the position and/or Rouch returned from Rome.  Rubino laughed at Petruska, stating that being "enough of a feminist" was like being "a little pregnant."  Rubino represented to Petruska that she would not be replaced when Rouch returned from Rome.  Rubino further represented to Plaintiff that her tenure as Chaplain would be based upon her job performance, not her gender.  Rubino further represented to Plaintiff that Trautman had approved her appointment as permanent

Chaplain, and therefore, her gender would not play a role in future decisions affecting her leadership. Plaintiff sought these assurances despite Gannon representing itself as an equal opportunity employer because of:

        a. Gannon's custom and practice of gender based discrimination;

        b. Plaintiff's knowledge that the Chaplain's position had been previously promised to Rouch upon his return from Rome, which was to occur in one year, and Plaintiff's insistence that as a woman, she would not be used for that year only to be replaced when a male became available to fill the position;

        c. Plaintiff's knowledge that Trautman was Chair of the Gannon Board and had previously removed women from leadership positions in the Diocese based solely upon their gender when he became Bishop of the Diocese of Erie; and

        d. Trautman's reputation at Gannon for being unable to work with women.

18. Plaintiff detrimentally relied upon the false and misleading promises made to her by Rubino, and as a result, accepted the permanent position as Chaplain.

19. In addition to Plaintiff's own efforts to assure that she would not be removed because of her gender when a male became available to lead the Chaplain's Division, Sr. Mary Fromknecht, SSJ (hereinafter "Fromknecht"), then President of the Sisters of St. Joseph of which Plaintiff was a member, sought similar assurances from Rubino. Rubino and Fromknecht discussed the specifics of Plaintiff's position, including salary and benefits such as whether the University would provide Plaintiff a car. The conversation between Fromknecht and Rubino occurred by telephone in mid-April 1999.

Rubino represented to Fromknecht that he would not remove Plaintiff as Chaplain when a priest became available to fill the position as long as she remained "a valid role model in the position." Rubino further agreed to share his conversation with Fromknecht with Trautman.

20.    In March of 2000, subsequent to Plaintiff being appointed as Chaplain based upon Rubino's representation that she would not be replaced when a suitable male became available for the position, Rubino was forced to take a leave of absence as President of Gannon after allegations surfaced that he was having a sexual affair with a subordinate at the University, which he ultimately admitted to various University officials, including Trautman.

21.    Shortly after Rubino's leave another female employee at the University came forward and accused Rubino of having sexually harassed her for a number of years. Plaintiff was instrumental in bringing this claim to the attention of Trautman and Dr. Thomas Ostrowski (hereinafter "Ostrowski"), then Provost of Gannon.   Ultimately, the University entered into an agreement to settle this employee's claim of sexual harassment against Rubino.

22.    As a result of the allegations of misconduct set forth in paragraphs 20 and 21 above, Rubino resigned as President of Gannon in May of 2000.  Thereafter, Gannon engaged in a campaign to cover-up Rubino's sexual misconduct at the insistence of Trautman, who has engaged in a pattern and practice of covering-up the wrongdoing of males, and particularly priests at the University who have engaged in serious misconduct, to the detriment of the University, its faculty, staff, administration and students, with the knowledge and/or acquiescence of the Gannon Board.   University officials, including

9

Plaintiff, Ostrowski, and David Fabian (then Gannon's communication director) encouraged the University to simply acknowledge that the reasons surrounding Rubino's departure were a confidential personnel matter, instead of falsely representing the reasons for his departure.  Trautman responded that telling the truth would be crazy.

23.    In May of 2000, Ostrowski was appointed acting President of Gannon University.  As acting president, Ostrowski was permitted to apply for the position of President.

24.    In July of 2000, Ostrowski met with Trautman and Rouch, who had returned from Rome.  Trautman informed Ostrowski that he was creating the new position of Vice President for Mission and Ministry and that Rouch would be appointed to this position.  Trautman further instructed Ostrowski that he needed to remove Plaintiff as Gannon's Chaplain.  When Ostrowski refused to do this, Trautman instructed Ostrowski to restructure the Chaplain's Division by placing it under the leadership of Rouch.  Once again, Ostrowski refused to comply with the Bishop's directive because he was too principled to engage in this illegal discrimination.  This meeting establishes that Trautman and Rouch intended to discriminate against Plaintiff on the basis of her gender.

25.    As set forth above, the position of Vice President for Mission and Ministry was created by Trautman, not the University.   While the University's bylaws give the Chair of the Board the right of consultation before certain vice presidents are appointed and/or removed, the Chair is not authorized to create new vice presidencies.  At the time this appointment was made by Trautman, the decision to create new academic or non-academic positions was placed with the president of the University.  This new vice presidency was created just a few years after the University had engaged in program

10

review and determined that it had too many top level administrators.  As a result of program review, the University eliminated several vice president level positions. Moreover, this position was created without any input from the University, its administration, or the interim president having determined a need for it.  It was created without a job description showing there was no need for the position, as there was nothing for the person in the position to do.  This vice president, cabinet level position was filled by a part-time employee of the University.  This position was created for the purpose of removing a woman as head of the Chaplain's Division as evidenced by the meeting between Ostrowski, Trautman and Rouch set forth in paragraph 24.  The lack of need for this position is further evidenced by the fact that this vice president, cabinet level position is now only a two day a week position because Rouch is also the Vicar for Education for the Diocese of Erie, where he works three days per week, showing that there was and is no real need for this position at Gannon.

26.    On July 28, 2000, Ostrowski informed Plaintiff that he had met with Trautman and Rouch.  He related that a new vice president position had been created by Trautman and that Rouch was to be appointed to the position.  Ostrowski then inquired as to how Plaintiff would respond if the Chaplain's Office were placed under the leadership of the Vice President for Mission and Ministry.  When Plaintiff said she would challenge such a decision, Ostrowski conceded that this action was being taken against Plaintiff on the basis of her gender, female.  Ostrowski promised to do what he could to prevent Trautman and Rouch from implementing this decision and removing her as the head of the Chaplain's Division.  Ultimately, Ostrowski advised Plaintiff that he could delay the implementation of this decision, he could not prevent it.

27.    On or about August 10, 2000, Plaintiff met with Trautman and challenged his plan to assign Rubino to Seton Hall University as part of the ongoing cover-up of Rubino's misconduct.  Upon information and belief, this assignment was made to dispel the numerous rumors surrounding Rubino's unusual departure from Gannon for "health reasons," which had negatively impacted Gannon's enrollment because so many people believed the reason given for Rubino's departure was false.

28.    On October 2, 2000, Ostrowski gave Plaintiff a revised contract as Chaplain to make her contract commensurate with that of other vice presidents at the University.  As a result, her contract with the University was extended to three years and was to run through June 30, 2003.  According to the Policies and Procedure Manual of the University, the duties of the Chaplain are to serve as head of the Chaplain's Division as well as on the President's Staff, among other things.

29.    In January of 2001 Plaintiff was at a meeting with Ostrowski when Ostrowski was informed that Trautman would prevent him from becoming the next President of Gannon University.  At this same meeting, Ostrowski was informed that once a new president was appointed, Trautman intended to "clean house."  Ostrowski was advised that this "house cleaning" meant the removal of the acting Provost, the Executive Director of Admissions and the University Chaplain, all of whom are female. None of these women are currently employed at the University.

30.    During the months of March through May, 2001, Plaintiff was repeatedly approached by Ostrowski to consider accepting another position at the University. Ostrowski made it clear to Plaintiff that Trautman and Rouch would never let her remain Chaplain at Gannon because of her gender, but she could remain at the University in

another capacity. Plaintiff made it clear to Ostrowski that she would not take another position at the University. Plaintiff repeatedly informed Ostrowski that if Trautman and Rouch wanted to discriminate against her on the basis of her gender by removing her as Chaplain, they would have to do so openly.

31.    On or about April 19, 2001, Ostrowski was removed from consideration in the search for a new president based upon a misrepresentation made to him by the Chair of the Presidential Search Committee, Fr. Lawrence E. Brandt, now Bishop Brandt. Upon information and belief, Ostrowski was removed from consideration in the search for a new president because of his role in exposing Rubin's misconduct and because he opposed Trautman and Rouch's efforts to discriminate against Plaintiff because of her gender.

32.    On May 21, 2001 Garibaldi was appointed President of Gannon by the Board of Trustees. As set forth previously, he began his tenure as President on July 1, 2001.

33.    Before Garibaldi even assumed the duties of President, Rouch began to pressure him to remove Plaintiff as Chaplain of the University.

34.    After Garibaldi became President, it became apparent that Plaintiff would not be permitted to function as Chaplain of Gannon. All important decisions traditionally made by the Chaplain were required to be taken to Rouch at the insistence of Garibaldi. Moreover, the Chaplain was never consulted on any issue impacting the Catholic identity of the University once Garibaldi became president, even though the Chaplain served as co-chair of the University's Catholic Identity Task Force.

35.    On September 14, 2001, Plaintiff was instructed by Garibaldi that she was

not to make decisions traditionally made by the Chaplain without consulting him.
Plaintiff was instructed to make recommendations to the President, who was to make the
decisions. Specifically, Plaintiff was told "This is a soft Alexander Haig, and I am in
charge here." Apparently, Plaintiff had acted inappropriately in exercising her duties as
Chaplain in having decided to hold various prayer services in response to the terrorist
attacks of September 11, 2001.

36.     On February 11, 2002, Plaintiff met with Garibaldi for her six-month
evaluation. This meeting lasted approximately fifteen minutes. Later Plaintiff learned
that the evaluations of other members of the President Staff were very different from her
own and lasted much longer. Specifically, Plaintiff learned that other members of the
President's Staff, whom Garibaldi apparently intended to keep on his staff, received
substantive and detailed evaluations, while those who had been targeted for removal did
not. The only other member of the President's Staff  whose evaluation was similar to
Plaintiff's was that of the acting Provost also a female, who had also been previously
targeted for removal by Trautman.

37.     On April 5, 2002, Plaintiff met with Trautman on an unrelated matter.
Plaintiff challenged the propriety of permitting a former Gannon priest to be on campus,
when he had been removed because of acts of sexual misconduct directed towards
students. This priest was on campus daily despite the emerging clergy abuse scandal.
Trautman informed Plaintiff that he would restrict but not deny the priest's access on
campus. Plaintiff was demoted not only because she is a woman, but because she is a
woman who dared to challenge the propriety of the Board Chair's ongoing cover-up of
priest sexual misconduct and his insistence that abusive clergy be permitted on campus as

part of the ongoing effort to cover-up such misconduct. Upon information and belief, this same priest that Trautman banned from campus after his meeting with Plaintiff has been permitted to return to campus with Trautman's knowledge and consent after Plaintiff's removal, further demonstrating Trautman's pattern and practice as Chair of the Gannon Board to cover-up clergy misconduct to the detriment of the University by exposing its students to potential future harm. Trautman has taken these actions intentionally, knowing that the priests at issue pose a risk of harm to others, and has acted with a reckless and careless indifference to the rights and safety of others in breach of his fiduciary duty to the University.

38.　　At this same meeting, Plaintiff, Trautman and Rubino discussed the propriety of Rubino being on campus in light of his misconduct. During this discussion and in Plaintiff and Trautman's presence, Rubino threatened to sue any woman who came forward against him if they were not 100% accurate. Trautman made no response to this threat made in his presence. When Plaintiff reported that no other women were willing to come forward in light of Rubino's threat, but it remained inappropriate for Rubino to be on campus in light of his history of misconduct, Trautman yelled at Petruska insisting that there had been no cover-up in the Rubino situation, despite the fact that the University at Trautman's insistence had, in fact, covered up the true reasons for Rubino's departure and provided false information as to why Rubino "resigned."

39.　　The situation at Gannon continued to deteriorate during the course of Garibaldi's first year as president and culminated in Plaintiff being summoned to Garibaldi's office on April 18, 2002. At this meeting Plaintiff was informed that she was to limit her comments when she was invited to speak at University events as Chaplain.

15

At this meeting, Plaintiff questioned how her conduct was different from that of Rouch, a male, who had not been limited in the same way. Plaintiff was told that she was not there to discuss Rouch's behavior, but her own.

40.    Shortly thereafter, Plaintiff requested additional information from Garibaldi, as she had been informed by Garibaldi that "others" at the University had complained about her conduct, which resulted in the meeting of April 18, 2002. At a meeting on April 22, 2002, Garibaldi sheepishly admitted that he lied to Plaintiff and no one had complained to him. Garibaldi further stated that he thought Plaintiff's comments were inappropriate because she was "showing up more important people," which Plaintiff understood to mean males attending the event including Garibaldi. Once again Plaintiff sought an explanation as to how her remarks were different from Rouch's and Garibaldi refused to offer an explanation. However, Garibaldi did make a point of telling Plaintiff he assumed she was the first female Chaplain at Gannon and this was not about Plaintiff's role as Chaplain.

41.    On June 3, 2002, Plaintiff was given a positive evaluation by Garibaldi. A copy of this evaluation is attached hereto and incorporated herein as Exhibit 1. A repeated recommendation contained in the evaluation was that Plaintiff should work more closely with the Vice President for Mission and Ministry in the coming year, showing that at this time Garibaldi had already decided to "restructure" the Chaplain's Division by placing it under Rouch.

42.    Shortly thereafter, Plaintiff was presented with her annual renewal contract. Garibaldi failed to inform Plaintiff that her duties and responsibilities would be reduced in the coming year prior to her executing this contract.

16

43.    In July and August, 2002, members of the University were instructed to alter Freshman Convocation to include a liturgy.  Even though University liturgies were the responsibility of the Chaplain's Office, Garibaldi failed and refused to appoint Plaintiff to the planning committee.  Rather, Plaintiff was invited to attend planning meetings by other University officials.  Thereafter, in meetings of the President's Staff, Garibaldi refused to deal with Plaintiff with respect to issues pertaining to this liturgy.  Rather, Garibaldi directed all questions to Rouch, a male, because he refused to deal with Plaintiff, a female, until Rouch could not answer the questions directed to him.  This liturgy was later removed from the Freshmen Convocation program after Plaintiff's constructive discharge because it proved to be unworkable as Plaintiff advised the President's Staff that it would be.  Garibaldi's response to Plaintiff's concerns about this plan was:  "You can say whatever you want, Sister, as long as you do what I tell you to do when you are finished."  Plaintiff never witnessed Garibaldi speak like this to the male members of the President's Staff

44.    On August 21, 2002, Plaintiff was informed by Garibaldi that he had decided to do some "restructuring" at the University.  Plaintiff was informed that she would be removed from the President's Staff and that the Chaplain's Division would be placed under the leadership of Rouch.  This restructuring was accomplished in violation of the University's Governance Manual in that Garibaldi effected this restructuring without presenting it to the University's President's Council, as he was required to do, for consultation and approval.  Garibaldi avoided using the University's regular and established procedures to effect this restructuring to further his conspiracy with Trautman, Rouch and the Board to discriminate against Plaintiff on the basis of her

gender and to retaliate against her because she dared to challenge the ongoing cover-up of sexual harassment and sexual misconduct by priests employed by the University, as well as gender-based discrimination on campus, activity protected by Title IX.

45.    As further evidence of this conspiracy, Garibaldi admitted that he had discussed this issue with Rouch and Trautman on previous occasions, which is not surprising since his "restructuring" plan mirrored the one previously developed by Trautman and Rouch two years before in their effort to remove a woman from leadership of the Chaplain's Division.  Garibaldi further represented that this issue had been discussed with the Executive Committee of the Board.  However, the only female member of the Executive Committee was not involved in any such discussions.  Garibaldi further represented that he was taking this action based upon a recommendation of the Middle States Committee.  When Plaintiff informed Garibaldi that she was on the Committee and had not seen a recommendation for such a restructuring, Garibaldi retracted this statement and stated that Middle States had recommended that Rouch be given a job description.  However, Middle States had not recommended that Rouch be given Plaintiff's job.  Plaintiff informed Garibaldi that she knew this action was being taken against her because of her gender, but she did not explain how she knew this.  She further informed Gariibaldi that she would be open to a "buy out" of her contract. Plaintiff made this offer because she is aware that males who had been involved in acts of sexual misconduct, specifically sexual harassment, have been bought out of their contracts by the University.  Plaintiff believed that those who are the victims of sexual discrimination/retaliation should be treated at least as favorably as the perpetrators of such misconduct.   While Garibaldi represented at that time that he would be willing to

talk to Plaintiff about this "restructuring" in the future, Garibaldi refused to discuss this matter with Plaintiff further.

46.    While the University has apparently taken the position that the decision to demote Plaintiff and remove her from the President's Staff was a simple "restructuring," the allegations set forth above show that the restructuring was nothing more than a pretext to engage in illegal gender discrimination and retaliation against Plaintiff by removing her as the head of the Chaplain's Division, so that Rouch, a male could lead it, and so that Gannon's ongoing cover-up of priest sexual misconduct would continue without challenge, since Rouch would not challenge Trautman's actions regarding the cover-up of priest sexual misconduct because Rouch had been investigated for similar misconduct based upon a student's accusation.

47.    After her meeting with Garibaldi, Plaintiff orally requested information as to whether she could file a discrimination grievance with the University Review Council, the internal forum for resolving grievances against the University.  In correspondence dated August 28, 2002, Plaintiff was informed that the University Review Council was not a proper forum for her grievance because the grievance was against the president and the Chair of the Board.  A copy of this correspondence is attached hereto and incorporated herein as Exhibit 2.

48.    Faculty, students and staff were informed of Plaintiff's demotion from head of the Chaplain's Division on October 1, 2002.  This announcement caused Plaintiff to suffer humiliation and embarrassment, as some questioned what she had done to be removed as head of the Division.

49.    On September 30, 2002 Rouch called Plaintiff and stated he wanted to talk

to her about the "restructuring." Plaintiff informed Rouch that she did not see the value in meeting with him until her concerns about the University's illegal gender discrimination against her were resolved with Garibaldi. On the same day, Plaintiff sent and email to Garibaldi informing him of the public comment she intended to make about the "restructuring," particularly its questionable motive. Additionally, Plaintiff stated that she was willing to meet with Garibaldi to discuss how all parties could move forward despite this illegal discrimination. Plaintiff's only condition for such a meeting was that the president of her congregation, who was and is an ex officio member of the Board, be present.

50.    Garibaldi failed and refused to respond to the request for a meeting.

51.    On September 30, 2002, Trautman called Ricarda Vincent (hereinafter "Vincent"), the president of Plaintiff's community. Plaintiff does not know the specifics of this conversation, only that Trautman "yelled" at Vincent.

52.    The next day, October 1, 2002, Plaintiff met with Vincent and was instructed that she could not take any action against Gannon as a result of Gannon's illegal discrimination against her, nor was she to make any comment about what Gannon had done to her. Upon information and belief, Plaintiff was prohibited from protecting her rights under the laws of the United States as a direct and proximate result of Trautman's instructions to Vincent the previous day.

53.    On October 7, 2002, Rouch once again called Plaintiff to discuss the "restructuring." Plaintiff responded with an email to Garibaldi that she had not received a response to her request for a meeting.

54.    On October 8, 2002, Garibaldi sent an email to Plaintiff informing her that

if she refused to report to Rouch, or more specifically refused to cooperate in the illegal discrimination against her, the University would take "appropriate action." Plaintiff understood this to mean that she would be terminated and confirmed this interpretation with other employees at the University, who advised her that she needed to quit before she was fired so that she would not have to report on future job applications or in interviews that she had been fired by Gannon.

55.     Additionally, and without waiver of the foregoing, the hostile and oppressive work environment that Plaintiff had suffered since Garibaldi had been appointed president of the University was having an adverse impact on Plaintiff's health, particularly because Plaintiff had known for two years that Trautman and Rouch wanted to remove her from leadership and that they had found an ally in Garibaldi to effect their discriminatory and retaliatory plan, whose hostile treatment of Plaintiff had an adverse impact on her health.

56.     The actions of the Defendants in demoting Plaintiff, threatening her with discipline if she continued to oppose the illegal discrimination she had suffered, and in creating a hostile and oppressive work environment that negatively impacted Plaintiff's health and which upon information and belief was designed to force Plaintiff to resign, had the foreseeable result that Plaintiff's working conditions would be so unpleasant or difficult that a reasonable person in her shoes would resign and were further intended to cause Plaintiff to resign.

57.     Because Plaintiff believed she was about to be fired because of her opposition to the illegal discrimination that was being taken against her, Plaintiff served Gannon with two weeks notice on October 14, 2002. Plaintiff was constructively

discharged from the University based upon its illegal discrimination, hostile treatment, and threats directed at Plaintiff in an effort to cover-up its own misconduct.

58.     On October 15, 2002, Rouch and Cline (hereinafter "Cline"), entered Plaintiff's office.  Rouch informed Plaintiff that her resignation was accepted effective immediately and that she was to pack her belongings and leave the campus.  Rouch then informed Plaintiff that she could only be on Gannon's campus with the University's permission and that her contact with the students would be limited.  Plaintiff was humiliated as a result of these actions because she knew that those involved in serious acts of sexual misconduct had not been banned from Gannon's campus as she had been. This action in particular was retaliatory against Plaintiff because she had opposed Trautman allowing priests involved in sexual misconduct on campus as part of the ongoing cover-up of such misconduct.  Gannon refused to commit these limitations to writing, despite Plaintiff's request.  Therefore, Plaintiff prepared and sent a letter to Gannon memorializing this conversation, which is attached hereto and incorporated herein as Exhibit 3.

59.     On October 16, 2002, Cline informed Plaintiff that the University would review all of her emails.  Plaintiff objected to this but does not know if Gannon reviewed her email messages despite her objections.  Plaintiff does not know if it is standard policy or practice for the University to read current and/or former employees' emails.  However, Plaintiff believes this action was threatened and/or taken against her only because she accused the University of illegal discrimination.

60.     In terminating Plaintiff, Gannon treated her differently from males, and particularly priests, who have been forced to resign because of their acts of sexual

misconduct and/ or other illegal activity. Priests who have engaged in acts of sexual misconduct, even those involving students, were given free access to the University and its students so as to ensure to cover-up of such misconduct. Additionally, upon information and belief, another priest who was banned from campus for acts of sexual misconduct during Plaintiff's tenure was allowed to return to campus. Plaintiff was treated like she is more dangerous than those involved in sexual misconduct because she dared to accuse the University of illegal discrimination.

61.     Plaintiff, who simply did her job well, was demoted upon the basis of her gender and in retaliation for engaging in activity protected by Title IX, and as a result was treated less favorably than males and particularly priests, who have:

        a.      Engaged in acts of sexual misconduct involving students and staff;

        b.      Engaged in acts of sexual harassment;

        c.      Created a hostile learning environment, particularly for female students; and

        d.      Engaged in criminal misconduct.

62.     After Plaintiff was constructively discharged as Chaplain of Gannon, Rouch stated on several occasions to both students and staff that a female would not be considered to replace Plaintiff as Chaplain.

63.     The discrimination against Plaintiff by Defendants as set forth above was intentional. Moreover, Defendants have acted with reckless and malicious indifference to the federally protected rights of Plaintiff, making an award of punitive damages appropriate and necessary in this case to punish Defendants and to deter them and others from the same or similar transgressions in the future.

64.     As a result of the misconduct of the Defendants as set forth above,

Plaintiff has suffered damages in the amount of at least $100,000.00, to include but not

necessarily be limited to at least $50,000.00 in lost wages and benefits, as well as damage

to her career and reputation, emotional pain and suffering, inconvenience, mental

anguish, humiliation, embarrassment, and stress in the amount of at least $50,000.00.

**COUNT I**
**TITLE IX GENDER DISCRIMINATION**
**AGAINST ALL DEFENDANTS**

65.     Plaintiff alleges and incorporates by reference as if fully set out herein,

paragraphs 1 - 64 above.

66.     Defendants intentionally discriminated against Plaintiff as set forth herein

based upon her gender, female, in her employment by a federally funded educational

program within the meaning of Title IX.

67.     The United States Supreme Court had held that Congress may attach

"reasonable and unambiguous conditions to federal financial assistance that educational

institutions are not obligated to accept" consistent with the First Amendment to the

United States Constitution.

68.     While Gannon is a religiously affiliated educational institution, the

intentional gender-based discrimination of Plaintiff as set forth herein does not fall within

the religious exemption set forth at 20 U.S.C. §§ 1681(a)(3) and/or 1687  in that the

discrimination of Plaintiff on the basis of her gender was not required by the religious

tenets of the organization in that Plaintiff was a female when appointed to lead to

Chaplain's Division and remained a female throughout her tenure in the position,

showing that there was no requirement that only a person of a specific gender could hold

the position under the religious tenets of the organization.

69.    The actions, policies and practices complained of herein were in violation of Plaintiffs' rights secured by 20 U.S.C. § 1681 et seq.

70.    Due to the Defendants actions as set forth herein Plaintiff has suffered damage to her career and reputation, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress.

71.    The discrimination against Plaintiff by Defendants as set forth above was intentional.  Moreover, Defendants have acted with reckless and malicious indifference to the federally protected rights of Plaintiff, making an award of punitive damages appropriate and necessary in this case to punish Defendants to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiffs respectfully pray that this Court advance this cause on its docket, order a hearing at the earliest practicable date, and thereafter:

I.    Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and benefits and damages to Plaintiff for her emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress as a result of the Defendants' unlawful conduct.

II.    Order the Defendants to pay punitive damages.

III.    Award Plaintiff the costs of this action, together with reasonable attorney's fees.

IV.    Grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT II
## TITLE IX RETALIATORY DISCRIMINATION
## AGAINST ALL DEFENDANTS

72.    Plaintiff alleges and incorporates by reference as if fully set forth herein, paragraphs 1-71 above.

73.    Defendants retaliated against Plaintiff because she complained of sex discrimination, including but not necessarily limited to  sexual harassment and other sexual misconduct, wage discrimination, policies and procedures that failed to effectively address sex discrimination, and her own discrimination on the basis of sex, which was intentional discrimination prohibited by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

74.    As set forth above, Plaintiff was demoted, and ultimately constructively discharged, not only because she is a woman but because she is a woman who opposed Rubino's  sexual harassment of a subordinate, and Trautman's ongoing cover-up of priest sexual misconduct on campus, as well his practice of permitting abusive clergy on campus as part of the ongoing effort to cover-up this misconduct.

75.    In addition to the foregoing, in 1998 Plaintiff was appointed to serve on the University's Sexual Harassment Committee by Ostrowski, who was then Provost of the University.  At the time Plaintiff was appointed to this Committee, the University was in the process of amending its sexual harassment policy.  According to other University officials, Rubino had been accused of sexually harassing at least one other woman at the University at the time these amendments were under consideration, which was known by Trautman and the University's lawyers but not by Plaintiff.  At the time these amendments were under consideration, the University's attorneys, Elderkin, Martin,

Kelly and Messina, through Evan Rudert, were attempting to limit the timeframe that victims of sexual harassment could file a grievance with the University to 90 days. Plaintiff strongly opposed this amendment to the policy because it would prevent the University from investigating and addressing valid claims of sexual harassment made outside this timeframe.  Ultimately, Plaintiff prevailed on this issue, and the time for filing a sexual harassment complaint with the University was extended.

76.    Additionally, Plaintiff was the chair of the Institutional Integrity Committee for Gannon's Middle States accreditation report commencing with her appointment in the summer of 2001.  This report raised issues of gender-based inequality in the salaries paid to female employees.  Specifically, Plaintiff opposed and tried to force the removal of intentionally skewed data provided by the University to conceal gender-based pay disparities, which skewed data remained in the Middle States Report after Plaintiff left the University.  Additionally, Plaintiff challenged Gannon's policies, procedures and structures for addressing and resolving complaints of sexual harassment and other forms of discrimination on campus.  This report was critical of the University for, among other things, failing to require the University Ombudsperson to prepare an annual report so that the University could identify patterns or trends of discrimination and properly address these problems; appointing a University Ombudsperson who had no qualifications for or training in the position; failing to follow the University's own governance manual in appointing two male sexual harassment officers, when the operating guidelines required one of the University's sexual harassment officers to be female; and appointing a sexual harassment officer who had no qualifications for or training in the position.

77.    When Garibaldi requested that certain portions of the Institutional Integrity report, which were critical of the University be changed, the committee which Plaintiff chaired refused to modify the report, thereby including negative and critical comments of the University's policies, procedures and structures for resolving issues of harassment and discrimination.  These issues were brought to the University's attention in order to oppose gender discrimination prohibited not only by Title VII but also by Title IX in educational institutions.

78.    Plaintiff, as Chair of the Institutional Integrity Committee was instrumental in bringing these issues to the University's attention and in resisting the efforts by Garibaldi to remove commentary critical of the University from the report.

79.    While Gannon is a religiously affiliated educational institution, the intentional retaliation against Plaintiff as set forth herein does not fall within the religious exemption set forth at 20 U.S.C. §§ 1681(a)(3) and/or 1687 in that the retaliation Plaintiff suffered was not required by the religious tenets of the organization in that the misconduct Plaintiff opposed, particularly priest sexual misconduct, is specifically prohibited by the Roman Catholic Church.

80.    Due to the Defendants actions as set forth herein in retaliation of Plaintiff's efforts to oppose illegal gender discrimination, Plaintiff has suffered damage to her career and reputation, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress.

81.    The discrimination against Plaintiff by Defendants as set forth above was intentional.  Moreover, Defendants have acted with reckless and malicious indifference to the federally protected rights of Plaintiff, making an award of punitive damages

appropriate and necessary in this case to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiffs respectfully pray that this Court advance this cause on its docket, order a hearing at the earliest practicable date, and thereafter:

I.     Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and benefits and damages to Plaintiff for her emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress as a result of the Defendants' unlawful conduct.

II.     Order the Defendants to pay punitive damages.

III.     Award Plaintiff the costs of this action, together with reasonable attorney's fees.

IV.     Grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT III
## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS
## TO VIOLATE TITLE IX

82.     Plaintiff alleges and incorporates by reference as if fully set forth herein, paragraphs 1 - 81 above.

83.     Defendants Trautman, Rouch, Garibaldi and Rubino conspired with and amongst themselves in their official and individual capacities and with the Gannon Board to violate Plaintiff's rights secured under Title IX as set forth herein.

84.     Defendants conspired together and amongst themselves and as a result reached a mutual understanding to permit illegal gender discrimination and more

specifically priest sexual misconduct and sexual harassment and its cover-up to occur on the Gannon campus and to retaliate against those who opposed such conduct and more specifically conspired to remove Plaintiff as head of the Chaplain's Division and from the President's Staff and thereby to intentionally discriminate against her on the basis of her gender and to intentionally retaliate against her for engaging in activity protected by Title IX in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*  The conduct of the Defendants as set forth herein was designed to deter others from making similar complaints and/or opposing similar misconduct in the future.

85.    Defendants conspired together and reached a mutual understanding to undertake a course of conduct that violated Plaintiff and other employees and students' civil rights, and more specifically the rights secured to Plaintiff and others under Title IX. In furtherance of this conspiracy, the defendants committed the following overt acts:

a.    Defendants have engaged in a course of conduct designed to protect priests employed by the University from the consequences of their misconduct and particularly conduct that violates Title IX, such as sexual harassment and/or other sexual misconduct.

b.    Defendants allowed Rubino to remain President of Gannon University after they knew or through the exercise of reasonable care should have known that he was sexually harassing female employees of the University because it was more important for Trautman and the Board to protect the image of the priesthood than to protect employees from Rubino's misconduct.

c.    After Plaintiff complained to Trautman about the sexual misconduct of Rubino and another Gannon priest and Trautman's inadequate

response to it, and after Plaintiff objected to the presence of these priests on campus, the Defendants restructured the Chaplain's Office to remove Plaintiff as head of the Chaplain's Division and from the President's Staff in retaliation for her engaging in activity protected under Title IX, placing a priest as head of the Division who was unlikely to raise similar issues due to his own history.

      d.    Ultimately, Gannon attempted to ban Plaintiff from campus in retaliation for her efforts to keep priests who had engaged in acts of sexual misconduct off campus in furtherance of their conspiracy and in an effort to humiliate her by suggesting that she was more dangerous to Gannon students/ employees than the priests, who engaged in sexual misconduct, protected by the Defendants. It was only after Plaintiff and others made it clear that the banning of Plaintiff itself would be publicized that Gannon lifted its retaliatory ban of Plaintiff from its campus.

      e.    Trautman met with the President of Plaintiff's congregation to prevent Plaintiff from even discussing the discriminatory and retaliatory acts of the Defendants as set froth herein, all as part of the ongoing effort to cover-up illegal activity on the part of the Defendants.

      f.    Trautman required Plaintiff to inspect on campus housing to ensure that students were not displaying pornography in their private living quarters because pornography was "inconsistent with Gannon's Roman Catholic mission," while protecting priests who engage in acts of sexual harassment and other acts of sexual misconduct although equally "inconsistent with Gannon's Roman Catholic mission."

86.     Defendants collectively, or at least Trautman, Rubino, Garibaldi and Rouch acting individually and outside the course and scope of their duties as chair of the Gannon Board and/or employees of the University, shared the general conspiratorial objective which was to abuse Plaintiff and to violate her rights secured under Title IX and to insulate themselves from civil sanction by covering up an ongoing course of priest sexual misconduct on the Gannon campus as well as other acts of gender-based discrimination, which included the actions taken against Plaintiff as set forth herein. Such conduct is so pervasive at Gannon University and is so effective to insulate Defendants from civil sanction that Defendants felt free to engage in the misconduct aforedescribed without any fear of sanction.

87.     Trautman in particular felt so free to engage in the misconduct described above that when the inappropriate sexual relationship between Rubino and a subordinate became known to him, he stated:  "My priorities are first the Church, second the priesthood, third David, and fourth Gannon" in violation of his fiduciary duties to the Universtiy.

88.     Trautman in particular felt so free to engage in the misconduct described above that Rubino was permitted to transfer out of the Diocese on two separate occasions and most recently to a historically female college in another diocese despite Rubino being the subject of at least two claims of sexual harassment and an admitted inappropriate sexual relationship with a subordinate while at Gannon.

89.     All of the Defendants furthered the conspiracy by participating in it from its inception or by participating in the cover-up thereof so as to insulate themselves and others from liability for the outrageous and unlawful acts of the Defendants as described

32

herein.

90.     As a direct and proximate result of the conspiracy among Defendants, Plaintiff was deprived of the rights secured to her by Title IX.

91.     Plaintiff was injured as a result of this conspiracy in that she was, in fact, removed from her position of leadership based upon her gender rather than her job performance and in retaliation for engaging in activity protected by Title IX, which resulted in her constructive discharge from the University, causing her to suffer lost wages, damage to her career and reputation, emotional pain and suffering, inconvenience, mental anguish, humiliation, embarrassment, and stress.

92.     The conduct of all the Defendants, or at least Trautman, Rubino, Garibaldi and Rouch acting outside the course and scope of their duties,  was recklessly and callously indifferent to Plaintiff's civil rights, and particularly those secured under Title IX, malicious and wanton with respect to those rights, and an award of punitive damages is warranted and necessary to punish them  and to deter each of them and others from the same or a similar transgressions in the future.

WHEREFORE, Plaintiff respectfully prays that this Court advance this cause on its docket, order a hearing at the earliest practicable date, and thereafter:

I.     Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and benefits and damages to Plaintiff for her emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress as a result of the Defendants' unlawful conduct.

II.     Order the Defendants to pay punitive damages.

33

III.    Award Plaintiff the costs of this action, together with reasonable attorney's

fees.

IV.    Grant such other and additional relief as may appear to the Court to be

equitable and just under the circumstances.

## COUNT IV
## FRAUDULENT MISREPRESENTATION
## AGAINST GANNON, RUBINO, AND TRAUTMAN

93.    Plaintiff alleges and incorporates by reference as if fully set out herein,

paragraphs 1 - 92 above.

94.    In early June 1997, Rouch offered Plaintiff the position of Director, Center

for Social Concerns in the Chaplains Office but was unaware of the

specifics regarding compensation/benefits that went with the position.  As a result,

Petruska was instructed to meet with Cline, Gannon's Director of Human Resources in

the Human Resources Office.

95.    Plaintiff did meet with Cline in early June of 1997 to discuss the Center

for Social Concern's  position.  At that time, Cline, acting within the course and scope of

his employment and as an agent for Gannon,  informed Plaintiff as to the salary offered

for the position (diocesan wage for women religious, then $21,174.00 annualized), as

well as the benefits of the position to include but not necessarily be limited to health

insurance, life insurance, pension contribution to Plaintiff's congregation, vacation time

and retreat time.

96.    During the meeting between Petruska and Cline, Petruska made inquiry as

to Gannon's treatment of women because Gannon had a reputation for being an "old

boy's club."

97.     Based upon Plaintiff's inquiry regarding the treatment of women on campus, Cline represented to Petruska that Gannon was an equal opportunity employer that did not discriminate against its employees on the basis of gender, race, national origin.  Cline never advised Petruska that Gannon's equal employment policies and procedures did not apply to her as a ministerial employee of the Chaplain's Division.

98.     Rather, the application of these policies to ministerial employees of the Chaplain's Office was regularly reinforced by Cline and the University  during Plaintiff's tenure by Gannon representing itself as an "equal opportunity employer" when attempting to fill "ministerial" positions in the Chaplain's Office.

99.     Prior to accepting the Center for Social Concern's position at Gannon, Plaintiff had been offered but rejected an open position in the Diocese of Erie to coordinate its Respect Life/Justice and Peace Office.  Plaintiff declined this position after consultation with Fromknecht (then president of her congregation) because neither believed that the authoritative, patriarchal, and sexist environment of a Diocesan Office would be a conducive work environment for Plaintiff.  Therefore, Cline's misrepresentation was material to Plaintiff.

100.     Additionally, Plaintiff met with Rubino on at least two separate occasions about the soon to be open Chaplain's position in the spring of 1999 because Rubino had asked Petruska to consider accepting the open Chaplain's position.

101.     During a meeting in mid-April 1999 (upon information and belief April 9, 1999) in the president's office at which only Plaintiff and Rubino were present, Plaintiff advised Rubino that she was enough of a feminist that she did not want to be appointed to the position only to be replaced when a suitable male was found to fill the position and/or

Rouch returned from Rome.  Rubino laughed at Plaintiff's comment, stating that being "enough of a feminist" was like being "a little pregnant."  Rubino represented to Plaintiff that she would not be replaced when Rouch returned from Rome.  Rubino further represented to Plaintiff that her tenure as Chaplain would be based upon her job performance, not her gender.  Rubino further represented to Plaintiff that Trautman had approved her appointment as permanent Chaplain, and therefore, her gender would not play a role in future decisions affecting her leadership at the University.

102.    Prior to Plaintiff accepting the position as Chaplain, Fromknecht also had a conversation with Rubino about Plaintiff's appointment to the Chaplain's position because she wanted to ensure that Plaintiff would not be used to serve as University Chaplain only to be replaced when Rouch retuned from Rome or a suitable male became available to fill the position.

103.    Fromknecht had a telephone conversation with Rubino in mid-April 1999 about Plaintiff filling the Chaplain's position to include the financial terms and conditions of the appointment because Plaintiff would no longer receive diocesan wage under an agreement the Sisters of St. Joseph had previously made with Gannon University.  During this conversation Fromknecht made it clear that she did not want Plaintiff appointed to the position of Chaplain only to be removed when Rouch returned from Rome and/or some other male became available to fill the position.  Rubino represented to Fromknecht that Plaintiff would remain in this leadership position "as long as she was a valid role model in the position."  Rubino further represented that he would share his and Fromknecht's conversation with Trautman.

104.    As a result of the representations made by Rubino to Fromknecht,

Fromknecht supported Plaintiff accepting the Chaplain's position at Gannon. As set forth above, Plaintiff previously refused a position offered to her by the Roman Catholic Diocese of Erie after consultation with Fromknecht because of concerns similar to those raised with Rubino.

105.    The representations set forth above were material representations made to induce Plaintiff to accept both a position at Gannon and more specifically the position of Chaplain, as she had made it clear that she would not tolerate being used by the University until a suitable male came along to lead the Chaplain's Division.

106.    Cline knew that his representations to Plaintiff were false or acted with recklessness as to whether such representations were true of false when he made the representations to Petruska set forth above.

107.    Both Rubino and Trautman, knew that the representations made to Plaintiff by Rubino were false, or acted with recklessness as to whether the representations were true or false. Trautman and Rubino deliberately failed to disclose that they fully intended to return Rouch to the position of Chaplain or otherwise as head the Chaplain's Division upon his return from Rome, knowing that Plaintiff would not take the open position under these circumstances.

108.    Defendants made the representations set forth above with the intent of misleading Plaintiff and with the intent that she would rely upon these representations to her detriment and accept both the Center for Social Concerns and Chaplain positions at Gannon, which Plaintiff did.

109.    Plaintiff justifiably relied upon the representations at issue, as she had no reason to know that they were false at the time they were made, and moreover, had no

reason to believe an ordained member of the Roman Catholic Church would intentionally mislead her to induce her to take the open position.

110.    Plaintiff was injured as a result of her reliance upon the representations set forth above in that she was, in fact, removed from her position of leadership based upon her gender rather than her job performance and without recourse because the University thereafter took the position that the Equal Employment Opportunity laws did not apply to her as a ministerial employee, which has caused her to suffer damage to her career and reputation, emotional pain and suffering, inconvenience, mental anguish, humiliation, embarrassment, and stress.

111.    The conduct of the Defendants as set forth herein was outrageous because of the Defendants' evil motives and/or their reckless indifference to the rights of Plaintiff. Moreover, such conduct, as set forth herein, was malicious, wanton, reckless, willful, and/or oppressive, justifying an award of punitive damages against these Defendants.

WHEREFORE, Plaintiffs respectfully pray that this Court advance this cause on its docket, order a hearing at the earliest practicable date, and thereafter:

I.    Order Defendants to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and benefits and damages to Plaintiff for her emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress as a result of the Defendants' unlawful conduct in an amount of at least $100,000.00.

II.    Order the Defendants to pay punitive damages.

III.    Award Plaintiff the costs of this action, together with reasonable attorney's fees.

IV.     Grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT V
## BREACH OF CONTRACT AGAINST GANNON AND GARIBALDI

112.     Plaintiff alleges and incorporates by reference as if fully set out herein, paragraphs 1 - 111 above.

113.     On July 1, 1999, Plaintiff assumed the duties of the University Chaplain, pursuant to a contract entered into between Plaintiff and Rubino.

114.     In September, 2000, after Plaintiff had learned of the intentions of Trautman and Rouch to remove her as Chaplain or replace her as head of the Chaplain's Division, Plaintiff requested a multi-year contract as Chaplain so that her contract would be commensurate with other Vice Presidents on the President's Staff.  Plaintiff was offered an amended three-year contract on October 2, 2000, which was signed by the acting President of the University, Ostrowski, on November 8, 2000.  A copy of this contract is attached hereto and incorporated herein as Exhibit 4.

115.     According to the Polices and Procedures Manual of the University, the responsibilities of the University Chaplain were to serve on the President's Staff and to lead the Chaplain's Division.  These were essential terms of the contract entered into between Plaintiff and the University.

116.     Defendants Gannon and Garibaldi breached the terms of this contract when Garibaldi unilaterally altered the terms and conditions of Plaintiff's contract by removing her as head of the Chaplain's Division and from the President's Staff while Plaintiff had a year remaining on her contract.

117.     Plaintiff was damaged as a result of this breach of contract in that she was,

in fact, removed from her position of leadership based upon her gender rather than her job performance, which resulted in her constructive discharge from the University, causing her to suffer lost wages, damage to her career and reputation, emotional pain and suffering, inconvenience, mental anguish, humiliation, embarrassment, and stress.

118.    The breach of Plaintiff's contract by Defendants was wanton and/or reckless under circumstances where the contract was to render performance of such a character that Defendants had reason to know when the contract was made that its breach would cause mental suffering and did, in fact, cause such suffering, resulting in bodily harm.

WHEREFORE, Plaintiffs respectfully pray that this Court advance this cause on its docket, order a hearing at the earliest practicable date, and thereafter:

I.    Order Defendant Gannon, as well as Defendant Garibaldi, in his official and/or individual capacity, to make Plaintiff whole for any and all losses or damages she has suffered, including but not limited to lost wages and benefits, as a result of this breach of contract in the amount of at least $50,000.00.

II.    Award damages to Plaintiff for her loss of reputation, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress in the amount of at least $50,000.00.

III.    Award Plaintiff the costs of this action, together with reasonable attorney's fees.

IV.    Grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

Respectfully submitted,


By ___/s/ AnnDrea M. Benson w/permission___
      AnnDrea M. Benson, PA82563
      12270 Woodside Drive
      Edinboro, PA 16412-5302
      Telephone (814) 734-3428
      Facsimile: (814) 734-3428 (same)
      benson_mcfarlane@verizon.net

      Pleban & Associates, L.L.C.


By ___/s/ C. John Pleban_____
      C. John Pleban, MO24190
      2010 South Big Bend Blvd.
      St. Louis, MO  63117
      Telephone:  314/645-6666
      Facsimile:  314/645-7376
      cpleban@pleban.law.com

      Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:  Frank L. Kroto, Jr., Arthur D. Martinucci, and Evan C. Rudert.  A true and accurate copy of the foregoing Second Amended Complaint was also mailed, postage prepaid to Evan Rudert, 150 East Eighth Street, Erie, PA 16501-1269, attorney for defendants Gannon University, the Board of Trustees of Gannon University, all members of the Board of Trustees and Trautman, Garibaldi, Rubino and Rouch in their official capacities, and to Arthur D. Martinucci and Frank Kroto, Jr., 222 W. Grandview Blvd., Erie, PA 16506, attorneys for Trautman, Garibaldi, Rubino and Rouch in their individual capacities, this 25th day of June, 2007.


                    ___/s/ C. John Pleban_____